UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------
IN RE:                                     )         CASE NO. 06-30835 (ASD)
                                           )
DOMINICK T. PEBURN,                        )         CHAPTER 7
                                           )
        DEBTOR.                            )
------------------------------------------------------
SAMUEL BROMBERGER,                         )
                                           )
        PLAINTIFF,                         )         ADV. PRO. NO. 08-3003
                                           )
vs.                                        )
                                           )
DOMINICK T. PEBURN,                        )
                                           )
        DEFENDANT.                         )
------------------------------------------------------
HENRY BROMBERGER,                          )
                                           )
        PLAINTIFF,                         )         ADV. PRO. NO. 08-3004
vs.                                        )
                                           )
DOMINICK T. PEBURN,                        )
                                           )
        DEFENDANT.                         )
------------------------------------------------------

<u>APPEARANCES</u>:

    Peter L. Ressler, Esq.                    Attorney for the Debtor
    Groob Ressler & Mulqueen
    123 York Street, Ste 1B
    New Haven, Connecticut 06511-0001

    Samuel Bromberger                         Plaintiff *Pro Se*
    2744 Mid Lane,
    Houston, Texas 77027-4933

    Henry Bromberger                          Plaintiff *Pro Se*
    14 Kettle Creek Road
    Weston, Connecticut 06883

**MEMORANDUM OF DECISION FOLLOWING JOINT TRIAL ON
COMPLAINTS OBJECTING TO DISCHARGE**

ALBERT S. DABROWSKI, United States Bankruptcy Judge

## I. INTRODUCTION

The captioned jointly-tried and consolidated adversary proceedings were commenced by Samuel Bromberger and Henry Bromberger (hereinafter, together, the "Plaintiffs") through the filing of complaints (hereinafter, together, the "Complaints") objecting to the Debtor's discharge. Through the Complaints the Plaintiffs collectively assert five statutory predicates for denial of discharge under Bankruptcy Code Section 727(a).

The Court, having now reviewed and considered the evidence presented at trial, and the parties' respective briefs, determines the Debtor is not entitled to a discharge as more fully explained and particularized hereinafter.

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(J).

### III.  BACKGROUND

**A. Bankruptcy Case No. 06-30835**[1]

On June 7, 2006, the Debtor commenced Bankruptcy Case No. 06-30835 by the filing of a voluntary petition under Chapter 11 of the United States Bankruptcy Code staying pursuant to the automatic stay of 11 U.S.C. §362(a) a State Court Action[2] against the Debtor commenced by the Plaintiffs here. On April 30, 2007, the Debtor filed the *Disclosure Statement*, ECF No. 212, and *Chapter 11 Plan of Reorganization*, ECF No. 211, required by §1125(b) to which the Plaintiffs, as creditors, timely and vehemently objected[3] in their *Creditors Consolidated Objection to Approval of Debtor's Disclosure Statement* (hereinafter, the "Consolidated Objection"),[4] ECF No. 235.  Hearings scheduled for June 13 and June 27, and July 25, 2007, to consider the whether the Disclosure Statement contained "adequate information" as required by §1125(a)(1) were continued to August 1,

---

[1] The Debtor, having commenced three prior bankruptcy cases, is no stranger to this Court (Case No. 94-24265 (Chapter 7 filed December 12, 1994, discharge ordered June 3, 1995, closed August 31, 1995); Case No. 96-23097 (Chapter 11 filed September 6, 1996, dismissed May 21, 1997, closed August 26, 1997) (docket reflects no schedules filed); Case No. 06-30265 (Chapter 11 filed March 8, 2006, dismissed on motion of Debtor June 7, 2006, closed June 20, 2006)).

[2] On or about December 10, 2003, the Plaintiffs initiated a lawsuit in the Superior Court for the State of Connecticut, *Bromberger v. Peburn,* Case No. CV-06-5002722S, Judicial District of New Britain at New Britain (heretofore and hereinafter, the "State Court Action") seeking damages, attorney's fees and costs allegedly arising from the sale of real property.

[3] The Internal Revenue Service also filed an *Objection to Approval of Debtor's Disclosure Statement,* ECF No. 227.

[4] Through the Consolidated Objection the Plaintiffs asserted, *inter alia*, that the Disclosure Statement failed to provide "adequate information," *see* 1125(a)(1), ¶3, contained "misleading" and inconsistent valuation information "rendering it impossible . . . to determine whether approval or disapproval of the Plan is in a creditor's best interest," ¶4, asserting the valuation information was "useless," ¶7, citing the Debtor's repeated failures of recollection, ¶¶ 9 & 13, and alleging that the Debtor's behavior included a "breach of terms of an Operating Agreement," "theft," "embezzlement" and "misappropriation of assets," "misapplication of funds," noncompliance with tax obligations, and "excessive litigiousness". ¶12.

2007, to, *inter alia*, provide the Debtor an opportunity to file an amended disclosure statement on or before July 30, 2007.

On July 30, 2007, the Debtor filed a *First Amended Disclosure Statement*, ECF No. 257, and an Amended Chapter 11 Plan of Reorganization, ECF No. 256, to which Colduct Partners, as unsecured creditors, vehemently objected in their *Objection of Colduct Partners, to the First Amended Disclosure Statement of Dominic Peburn* (hereinafter, the "Colduct Objection"), ECF No. 258.[5] Following a hearing held August 1, 2007, the Court entered an Order converting the case to a case under Chapter 7, and a Chapter 7 Trustee (hereinafter, the "Trustee") was appointed. ECF No. 259.

## B. The Adversary Proceedings

*1. Adversary Proceeding No. 08-3003 (Plaintiff Samuel Bromberger)*

On January 9, 2008, Plaintiff Samuel Bromberger commenced Adversary Proceeding No. 08-3003. Specifically, through his complaint Samuel Bromberger seeks an order denying the Debtor a discharge under §727(a)(2)(A) (pre-petition transfer of property with intent to hinder, delay or defraud creditors) (Count One), §727(a)(2)(B) (post-petition transfer of property with intent to hinder, delay or defraud creditors) (Count Two), §727(a)(3) (concealment or failure to keep or preserve information related to financial condition or business transactions) (Count Three), §727(a)(4) (false oaths and accounts)

---

[5]The Colduct Objection asserted the First Amended Disclosure Statement, *inter alia*, lacked "adequate information," was connected to a "plan that cannot be confirmed as a matter of law," ¶¶ 3, 22 - 26, with "much incorrect" and "false" information contained therein, ¶ 7, failed to disclose relevant and important information and assets, ¶¶ 9 & 10, 12 - 16, and was otherwise "vague" and "useless", ¶17, and other deficiencies, appearing to the Court, like the assertions in Consolidated Objection as to the original Disclosure Statement, *see* fn. 4, to have considerable merit, and which paved the road to the Court's Order converting the Chapter 11 case to a case under Chapter 7, as noted above.

(Count Four), and §727(a)(5) (failure to account for loss of assets) (Count Five).[6]

*2. Adversary Proceeding No. 08-3004 (Plaintiff Henry Bromberger)*

On January 10, 2008, Plaintiff Henry Bromberger commenced Adversary Proceeding No, 08-3004. Specifically, through his complaint Henry Bromberger seeks an order denying the Debtor a discharge under §727(a)(2)(B) (Count One) and §727(a)(2)(A)(Count Two).

**C. The Trial**

Trial on the Complaints commenced on July 22, continued on August 26 and November 3, and concluded the evening of November 6, 2014. At the commencement of the trial, the parties estimated they required only that morning for the presentation of evidence. However, at the end of that day, the Plaintiffs expressed their need for at least another day. The protracted nature of the trial was, in part, the product of the *pro se* nature of the Plaintiffs. During the trial they marked numerous documents for identification, less were actually offered, and far less were actually admitted in evidence, many for a lack of simple authentication (*e.g.*, failure to offer *certified* records otherwise admissible). In addition, a significant cause of the prolonged nature of the trial, as discussed in more detail hereinafter, was the Debtor's non-responsive, evasive and intentionally obstructive answers to the Plaintiffs' questions which repeatedly derailed their inquiries, as was obviously intended.

During the trial the Court heard testimony from eight witnesses: the Debtor Dominic

---

[6] In his complaint, Samuel Bromberger labels his causes of actions "Claims" with the "First Claim bifurcated into two "counts" each related to a specific property. In his complaint Henry Bromberger labels his causes of action "First (& Second) Cause of Action". For purposes of this Memorandum of Decision the Court refers to Samuel Bromberger's "Claims" and Henry Bromberger's "Causes of Action" as "Counts".

5

Peburn, Attorney Anthony Fraulo, Robert Jaquish, Joline Peburn, Kenneth Lathrop, Yong Suk Seo, Debra Seipmann, and Eric Shields.[7] The parties submitted their respective brief's on January 8 and 9, 2015.  No trial transcript was ordered.[8]

## IV. DISCUSSION

"One of the central purposes of the Bankruptcy Code and the privilege of discharge is to allow the "honest but unfortunate debtor" to begin a new life free from debt". *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).  In the interest of protecting creditors, however, §727 provides for denial of the discharge under twelve enumerated subsections, see 11 U.S.C. § 727(a)(1-12), four of which are asserted in the Plaintiffs' Complaints as a basis for denying entry of a discharge in this case.[9]

Because §727 imposes an extreme penalty it "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'" *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (quoting *Bank of Pa. v. Adlman (In re Adlman)*, 541 F.2d 999, 1003 (2d Cir. 1976)).

In the instant proceedings, the determination of the Debtor's entitlement to a discharge begins and ends upon a consideration of Count Three of Plaintiff Samuel Bromberger's Complaint requesting a denial of discharge pursuant to Bankruptcy Code

---

[7] The Debtor testified over the course of three days -- July 22, November 3 and November 6, 2014. Attorney Fraulo testified on July 22, and was recalled on November 6, 2014. Jaquish, Joline Peburn and Lathrop testified on July 22, 2014. Seo testified on August 26, and was recalled on November 6, 2014. Seipmann testified on August 26, and continued on November 3, 2014. Shields testified on November 6, 2014.

[8] The Court has reviewed the digital audio recordings of the trial in their entirety.

[9] Sub-sections 727(a)(2),(3), (4) & (5). As previously noted the Plaintiffs assert both pre-petition and post-petition transfers of property each with intent to hinder, delay or defraud creditors, under (A) & (B), respectively, of subsection 727(a)(2).

Section 727(a)(3) which provides:.

> (a) The court shall grant the debtor a discharge, unless—
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

Distilled to its essence, Count Three alleges the Debtor to be masquerading as an honest and unfortunate debtor when in fact he deliberately concealed, falsified, and failed to keep, preserve and produce *without justification* documents and records related to his financial condition and business transactions precluding, obstructing and impeding creditors' ability to "disentangle", his financial affairs. S*ee* Samuel Bromberger Complaint,¶¶ 149 - 180 (incorporating by reference ¶¶ 1-148).

In *In Re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006),[10] a panel of the Second Circuit, addressing the purpose and intent of §727(a)(3), stated:

> The purpose and intent of [§ 727(a)(3)] of the Bankruptcy Act is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936); *see also Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir.1992) (stating that the purpose of § 727(a)(3) is "to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge"); *In re Martin*, 554 F.2d 55, 57—58 (2d Cir.1977) (stating that "[t]he denial of discharge serves both to deter inadequate record-keeping and to protect creditors whenever a failure to preserve records may have been motivated by fraud"). Section 727(a)(3) also ensures that "creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." *MeridianBank*, 958 F.2d at 1230.

---

[10] In *Cacioli,* the panel *affirmed* a decision by the United States District Court *in D.A..N. Joint Venture, L.P. v. Cacioli (In Re Cacioli)*, 332 B.R. 514 (D. Conn. 2005), *affirming* the decision by this Court in *Cadlerock Joint Venture, L.P. v. Cacioli (In Re Cacioli)*, 285. B.R. 778 (Bankr. D. Conn. 2002).

7

The Circuit Panel then discussed the two-step approach bifurcating the burden of proof under §727(a)(3) as follows:

> *To implement this record-keeping requirement §727(a)(3) provides a two-step approach. The initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained. White v. Schoenfeld, 117 F.2d 131, 132 (2d Cir. 1941). If the creditor shows the absence of records, the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified. White, 117 F.2d at 132; see also, In re Sandow, 151 F.2d 807, 809 (2d Cir. 1945) ("The statute puts the burden squarely upon the bankrupt who produces no financial records to produce at least a satisfactory explanation of their absence."); Underhill, 82 F.2d at 260 ("[Each] case must stand upon its own facts with the inquiry always as to whether the bankrupt has sustained [the] burden of justification which the statute places upon him for his failure to keep adequate records.").*

*Id*. at 235 (Emphasis added).

**A. Step One -- The Plaintiffs Have Met Their Initial Burden And Established That The Debtor Concealed, and Failed To Disclose and Produce Books Or Records From Which His Financial Condition And Business Transactions Might Be Ascertained**

With regard to Count Three, the Debtor's Post-Trial Brief, Adv. P. 08-3003, ECF No. 141, at 5-6, simply argues an alleged failure of the Plaintiffs' to satisfy their initial burden to demonstrate an absence of records,[11] and merely states:

> [Count Three] requires the plaintiff to prove that Peburn has concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information from which his financial condition might be ascertained.

---

[11] The remaining balance of the response asserts:

"[t]he fact that the trustee has not filed an adversary proceeding, or joined in this proceeding is sufficient evidence that the debtor has not violated the provisions of this section and the trustee has not been prevented from determining the condition of the bankrupt estate".

The trustee's failure to commence an independent adversary proceeding, and/or formally join the Brombergers in the present proceedings, is irrelevant. The Debtor's assertion that Trustee has not been prevented from determining the condition of the Debtor's bankrupt estate is not supported or suggested by the record of this case and proceeding.

8

> The objecting creditor must prove that Peburn failed to provide or maintain sufficient records to allow creditors or the Trustee to evaluate or reconstruct the present condition of the bankrupt estate. The plaintiff states in excess of thirty paragraphs to support his claim of a violation of this subsection.
> *Peburn state[s], in objection, that none of the allegation[s] contained in this [Count] are supported by any admitted document or testimony.*
> Therefore, the plaintiff has not sustained his burden.

(Emphasis added).

The Debtor's assertion in his Post-Trial Brief that the Plaintiffs have not satisfied their *initial* burden, defies the trial record, and, in fact, is directly contrary to the Debtor's own testimony that he produced no financial records.[12] The Plaintiffs clearly satisfied their initial burden under *Cacioli,* causing the burden shift to the Debtor "to satisfy the court that his failure to produce [records] was justified". *Id.*

**B. Step Two -- The Debtor's Failure To Keep, Preserve And Produce Books And Records From which his Financial Condition And Business Transactions Might Be Ascertained Was Not Justified.**

The Bankruptcy Code does not specify or define "justified" as that word is used in §727(a)(3). However, *Cacioli* instructs that:

> whether a debtor's failure to keep books is justified is "a question in each instance of reasonableness in the particular circumstances." *Underhill*, 82 F.2d at 259—60; *see also, Meridian Bank*, 958 F.2d at 1231 (stating that "[t]he issue of justification depends largely on what a normal, reasonable person would do under similar circumstances"). It is a "loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved." *Morris Plan Indus. Bank of N.Y. v. Dreher*, 144 F.2d 60, 61 (2d Cir. 1944).

*Id.*

In addressing this issue the Court, of course, is fully cognizant of *Cacioli's* reference

---

[12] The Debtor's explanation for the absence of records is discussed in Part IV(B), *infra*.

9

to *In re Martin*, 554 F.2d 55 (2nd Cir. 1977), and the determination therein that it was error to hold a debtor strictly responsible for the loss of financial records regardless of fault stating:

> where records have been lost or destroyed through no fault of the bankrupt, any prophylactic function to be performed by [§727(a)(3)] becomes minimal any is outweighed by the Bankruptcy Act's general policy in favor of giving the bankrupt a fresh start",

and holding that

> [d]ischarge should not be denied unless the [bankruptcy judge] finds this testimony to be false or concludes that the bankrupt was remiss in his efforts to trace the missing records.

Id. at 57-58.

At the outset the Court notes that the Debtor's Post-Trial Brief fails to discuss *Cacioli's* second step on which the Debtor now has the burden. Notwithstanding this failure, the Court has reviewed the trial record in its entirety to ascertain whether through his testimony, or any other component of the record, the Debtor has satisfied this burden.

> *1. The Debtor's Testimony Explaining His Failure to Produce Records As They Were No Longer Available To Him Through No Fault Of His Own Was Not Credible And He Was Made No Effort To Trace Or Recover Them*

The Debtor was engaged in a business involving numerous complex commercial real estate transactions.[13] The nature, volume, extent and complexity of the Debtor's many numerous business transactions compelled the creation and preservation of meticulous

---

[13] For example, as one part of his business ventures, the Debtor located, developed and eventually sold parcels of real property, including approximately 300 condominiums in and about New Milford, Connecticut. This finding is consistent with a prior determination by the undersigned judge in its February 26, 2013 *Memorandum of Decision on Chapter 7 Trustee's Complaint to Recover Funds* in this case in *Chorches. Chapter 7 Trustee v. Trinity Lutheran Church*, Adv. P. No. 10-03022, p.4, ¶2, ECF No. 72 (At all relevant times, the Debtor [Peburn] was a sophisticated real estate broker, developer and contractor, with over fifty years of experience in developing commercial properties, including approximately 200 to 300 commercial units of real property in and about New Milford, Connecticut." ).

records (i) as necessary and essential to his business operations, and (ii) with such records being indispensable to decipher the financial condition and aspects of that business activity. In light of the sheer number and complexity of his property and other business transactions, the Debtor could not have functioned without keeping and maintaining such records. And, the records and documents related to the Debtor's business activities, transactions and engagements, were originally created, maintained, and preserved by the Debtor himself, who was responsible for the direction of the financial side of his business, its day-to-day management, and maintenance and custody of the requisite books and records.

Nevertheless, upon repetitive demands of the Trustee incident to Section 341 meetings, the Debtor represented he could not find *any* documents, expanding that statement at trial with the explanation that some were lost in a basement flood, others were in the exclusive possession of his spouse, with the balance being records and documents he could not find. The Court finds this testimony incredible.

The Debtor's testimony in this regard finds no support or corroboration in the record and is simply a bald assertion by the Debtor who, as noted hereinafter, enjoys no credibility of any kind with this Court. It defies common sense that the Debtor's voluminous, extensive and important business records would *all* be lost or no longer available to him. Furthermore, as to what appear to be a substantial quantity of documents that he simply could not find, the Debtor made no effort to trace them as required for a discharge. *See Martin,* 554 F.2d at 58 ("[d]ischarge should not be denied unless the referee finds this testimony to be false *or concludes that the bankrupt was remiss in his efforts to trace the*

*missing records*").

Moreover, the testimony of Eric Shields,[14] a personal friend of the Debtor, contradicted the testimony of the Debtor that he had no records. Shields was initially understood by both the Court and the Plaintiffs to have been called to testify by the Debtor as an expert witness. Of significance was Shield's preliminary testimony that during the last three and one half years, the Debtor, *as his sole source*, provided him with documents and records from which he and the Debtor were able to piece together a synopsis of what really happened which he planned to convey to the Court.[15] Shield's testimony stands in stark conflict with and impeaches the Debtor's own testimony that he, himself, had no records, and is indicative of a concealment of records by the Debtor.

The Court also notes that the Debtor had a strong motivation to cover up his fraudulent activities and conduct, and the related conduct of others he directed and controlled. The record is replete with credible testimony from others that the Debtor engaged in fraudulent or otherwise egregious behavior. *Inter alia*, there was credible testimony from Fraulo that the Debtor conspired to defraud the FDIC,[16] used and

---

[14] Shields testified that the essence of a prior professional relationship with the Debtor was simply finding property for him to develop. Subsequently, he owned and operated a restaurant, and then become a car salesmen.

[15] Shields initially testified on the afternoon of November 6, 2014, that he had been present during all the testimony on July 22, August 26, November 3, and the morning and early afternoon of November 6, 2014. When the Plaintiffs, on *voir dire*, queried Shields as to what he intended to add to the matter, he responded that he planned to assist the Court and the Plaintiffs to understand the evidence. Upon further inquiry by the Court counsel for the Debtor stated he was not offering Shields as an expert and excused him from further testimony.

[16] The Debtor's role in attempting to recover property from the Federal Deposit Insurance Corporation is illustrative of his use of others to implement fraudulent schemes for his benefit. According to Fraulo, in a negotiated sale of the Debtor's former residence foreclosed upon by the FDIC, the Debtor, being unable to take title back himself in light of an FDIC policy precluding a foreclosed former title holder from obtaining such property without paying the full amount on the outstanding debt thereon, the Debtor,

threatened his former spouse to implement his fraudulent schemes, and engaged his own attorney to implement and achieve illicit agendas. There was credible evidence that he conspired with others to defraud banking institutions causing his spouse to sign false financial documents to obtain increasingly larger amounts of monetary lending which, absent the fraudulent representations, would clearly never have been approved. For example, Seipmann credibly testified that she signed multiple false lending and mortgage documents regarding property at Stilson Hill at the direction of the Debtor so as not to endure his physical abuse, including being thrown up against a wall. Moreover, she testified that in connection with every mortgage she took out cash that went to the Debtor, who controlled all aspects of this transactions.  He deliberately and wilfully used other parties and their accounts to conceal illicit business transactions and to conceal and cover his own involvement therein.

In certain instances, such as his misapplication bankruptcy estate funds, where his own wrongful conduct was clear and could not practically be imputed to others, the Debtor at trial admitted to his wrongful conduct. Specifically, he admitted to wrongful payments from bankruptcy estate funds to himself without authority "justifying" such conduct by the simple statement "I needed the money". He acknowledged false information on his schedules and Monthly Operating Reports reflecting non-existent alimony payments. However, in most other instances, being sophisticated and experienced enough to know he should not be the one to make false representations, the Debtor arranged, convinced and coerced others to assume that role and risk. Consequently, in these latter instances

---

represented and assisted by Attorney Fraulo in a manner Attorney Fraulo testified was constructed for the ultimate benefit of the Debtor, the Debtor needed and caused a third party to take title.

his own records might not present a citadel of crystal clear information regarding his own misconduct in those ventures. Nevertheless, as the Debtor controlled and benefitted from most if not all of these schemes, it is transparently obvious that production of his own records would have added depth and color to his role in directing and controlling the illicit conduct of others and illuminated his own benefit therefrom.

In addition, the Court finds that the Debtor's extensive trial testimony and related conduct was virtually never responsive, but far beyond that, was regularly obstructive, and deliberately evasive. The sarcasm and disdain attending many of the Debtor's non-responsive answers to admittedly poorly framed questions posed by the *pro se* Plaintiffs was a calculated attempt to derail their inquiries, to confuse, confound and scramble the record beyond the brink of intelligibility attended by his objective to conceal the truth.[17]

In many respects, the Debtor's behavior in this case can be fairly viewed as an extension of his conduct in the State Court Action. During the trial of these proceedings the Debtor acknowledged that in connection with the State Court Action he was "under the gun," by virtue of multiple asset disclosure orders which he ignored. Ultimately, the Debtor defied disclosure orders issued by four (4) state court judges, and upon the eve of a contempt citation for such defiance, filed the present bankruptcy petition staying the State Court Action by operation of the automatic stay.

While the Debtor avoided the likely imposition of sanctions in the State Court Action through operation of the automatic bankruptcy stay, he was then sanctioned by the undersigned judge in these proceedings for his wilful defiance of this Court's *Consolidated*

---

[17]Leading the Court on numerous instances to instruct him to confine his testimony to simply answering the Plaintiffs questions.

Order . . . of *Contempt* and *for Imposition of Sanctions*, ECF No. 73, and for "obstructive and dilatory conduct which has impeded the orderly progress of these proceedings". *See Second Consolidated Order . . . of Contempt and For Sanctions*, ECF No. 93, pp. 2 & 3 (fn1).

Watching this sophisticated Debtor's further pursuit of his strategy of deliberate non disclosure of information at trial by his obstructive, non-responsive, and evasive trial testimony and conduct, intended and employed to confuse, confound and obstruct the *pro se* Plaintiffs' legitimate attempts to inquire into his financial and business affairs, confirmed what was already evident from the record by conduct that preceded the trial, that this is a debtor pursuing an abusive bankruptcy agenda. Indeed, in this case the Debtor's conduct in virtually every respect depicts the polar opposite of the fair and honest debtor requisite for discharge relief.

Working with Attorney Fraulo to achieve illicit agendas,[18] masking his control of property by placing it in trust or the hands of others, causing his wife to transfer property to her sister as "the Brombergers were after it", coercing his wife at times by physical abuse, including throwing her up against a wall, to encumber property with ever increasing mortgages[19] based upon false information, were all part of this illicit agenda.

The Debtor at various times during his testimony explained false statements as well as documents formed for illegitimate purposes now surfacing in his financial wake by

---

[18]In response to questioning by the Debtor's attorney, Fraulo testified, *inter alia*, "as you know, what I was doing could be ethically challenged".

[19]For example, the Debtor, assisted by an accommodating loan officer, coerced his spouse to sign blatantly false loan applications on a two bedroom residence starting with applications in the monetary amount of $160,000, increasing to $260,000, then to $620,000 -- loans far in excess of value of the collateral.

repeatedly stating, *inter alia*, "I didn't understand," "I relied on my attorney to fix it later," or it was a fraud perpetrated by others without my knowledge. Coming from the sophisticated Debtor here who devised, implemented and controlled the underlying schemes, the Court finds these explanations pure nonsense. The Debtor is an experienced and well-informed businessman who knew at all times precisely what he was doing. The Court finds the Debtor's testimony coloring himself innocent of and oblivious to his former spouse's false financial representations and conduct, to be a bold faced lie intended to shield himself from the consequences of his own control and direction of her fraudulent conduct.[20]

Having observed and heard the Debtor's testimony at trial, the Court views the Debtor like the captain of a ship who sails wherever he desires without reference to any moral compass, and then, when the vessel runs aground, falsely proclaims he was below deck fast asleep, unjustifiably faulting the crew for the wreck. The Debtor's failure to produce records was nothing more than a simple strategy calibrated to avoid the light of day being cast upon his illicit business related conduct evidenced by those records.

In summary, the Debtor, motivated to conceal fraudulent and egregious conduct by himself and others acting at his direction, failed to produce any records or documents from which his financial condition and relevant business transactions might be ascertained. The Court finds the Debtor's explanation that he had no records to produce was false, and there was no other evidence to support a finding that his failure to produce any of the requisite records and documents was justified.

---

[20]Seipmann credibly testified that on numerous occasions she signed documents without knowing what she was signing, more specifically, that she "was directed by the Debtor to go to Attorney Fraulo's office to sign documents -- I did not pay attention -- just signed", or words to that effect.

*2. The Records Eventually Produced To the Trustee By Attorney Fraulo Were Not Business Records of the Debtor, And Were Not Otherwise Documents From Which The Debtors Financial Condition or Business Transactions Could be Ascertained.*

During his testimony the Debtor noted that Fraulo had provided documents to the Trustee and, at one point, made a supercilious statement in the form of advice to the Plaintiffs, that "you can get [certain documents] from Fraulo", or words to that effect. However, at no time did the Debtor testify that he delegated to Fraulo or relied him to keep or maintain his business records. Nor was there an assignment to or division of roles wherein Fraulo was responsible for, or evidence the Debtor relied upon him to be responsible for, making or maintaining the Debtor's business records. And Fraulo did not consider himself to be a record maker or keeper for the Debtor. *See Cacioli*, 463 F. 3d at 238, citing as instructive *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1300 (9th Cir. 1994) (appeal from the bankruptcy court's decision on remand from *Cox I) ("Cox II")*, noting that in *Cox II* "*the court focused closely on whether the partnership had a clear division of partnership roles . . . .*" (Emphasis added).

While Fraulo eventually produced to the Trustee a substantial quantity of his own documents, those documents were related to his legal actions and related assistance to the Debtor in certain matters. There was no argument in the Debtor's Post-Trial Brief or testimony of the Debtor, that Fraulo, who was one of the Debtor's several attorneys, was responsible for the much different and broader direction of the financial side of the Debtor's business, its day-to-day management, or for the maintenance and custody of the Debtor's books and records.

Furthermore, Fraulo belatedly produced his records in response to a subpoena and

requests by the Trustee only after the Debtor claimed at 341 meetings that he could find no documents. Moreover, the documents produced by Fraulo were provided in piecemeal fashion, were neither chronological, alphabetical, or organized in any manner, and were described by Fraulo as a "document dump". Even if timely produced these documents were limited to projects in which Fraulo was engaged representing only a small part of the Debtor's broad ranging and extensive business activities. As such, the belated, gradational production of Fraulo's own documents was insufficient to permit any party to timely, reasonably and effectively trace, evaluate, and reconstruct the Debtor's relevant financial condition or business transactions.

Finally, at trial the Debtor denounced Fraulo as a "liar" and conspirator against him.[21] In light of this testimony, the Debtor cannot credibly maintain that the records Fraulo provided to the Trustee reflected a "*true* presentation of the debtor's financial affairs," provided "creditors and the bankruptcy court with complete and *accurate* information," and "ensured creditors are supplied with *dependable* information on which they can rely in tracing a debtor's financial history." *See* page 7, *supra*, noting *Cacioli's* discussion of the purpose and intent of §727(a)(3) (citations omitted) (emphasis added). In summary, even if the Debtor's reference to Fraulo's production of records and/or his gratuitous trial comment that the Plaintiffs could get documents from Fraulo was an attempt to justify his own failure to produce records, that attempt falls woefully short of satisfactory explanation of their absence.

---

[21] In response to questioning by the Debtor's own attorney, Fraulo provided insight into the nature of his activity on behalf of the Debtor stating "as you know, what I was doing could be ethically challenged," suggesting Fraulo may have conspired with the Debtor, not against him.

18

## V. CONCLUSION AND ORDER

The Plaintiffs has established that the Debtor deliberately concealed, and failed to keep, preserve and produce any documents and records from which the Debtor's financial condition or business transactions might be ascertained, and the Court has further determined that there is no credible evidence that the Debtor's act of concealment and his failure to produce such documents was justified.

Accordingly,

**IT IS HEREBY ORDERED** that the objection to the Debtor's discharge based upon Bankruptcy Code Section 727(a)(3) is **SUSTAINED** and entry of a discharge is **DENIED**.[22]

This Memorandum of Decision shall constitute this Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052, and, as the Plaintiffs' joined each other in prosecuting their respective complaints, a Judgment shall enter simultaneously herewith in favor of each Plaintiff in the above-referrenced Adversary Proceedings, and an Order Denying Discharge shall enter simultaneously herewith in Case No. 06-30835.

Dated: October 26, 2015                                                 BY THE COURT

Albert S. Dabrowski
United States Bankruptcy Judge

---

[22] Having determined that the Debtor is not entitled to entry of a discharge on the Count Three discussed herein, it is unnecessary for the Court to consider the balance of Counts set forth in the Complaints.